UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) Case No. 4:07CR00081 HEA (AGF) |
| RUBEN VERDUGO, and | ) |
| ROSETTA MAENELLE BRISTON, | ) |
| | ) |
| Defendants. | ) |

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This matter is before the Court on the pretrial motions filed by Defendants Ruben
Verdugo ("Verdugo") and Rosetta Maenelle Briston ("Briston"). Pretrial matters were
referred to the undersigned United States Magistrate Judge under 28 U.S.C. § 636(b).
Defendant Verdugo filed a Motion to Suppress, seeking to suppress statements made by
him (Doc. No. 51).[1] Defendant Briston filed a motion to suppress evidence and
statements (Doc. No. 52), and motions for the government agents to retain rough notes;
for disclosure of favorable evidence; and for disclosure pursuant to Rules 404(b) and 609
(Doc. Nos. 53-55, respectively). In light of the government's response, Defendant
Briston agreed at the hearing that no further action was necessary from the Court with
respect to her three discovery motions.

---

[1]  At the hearing, Defendant Verdugo confirmed that he is not seeking to suppress
any evidence seized at or near the time of his arrest.

An evidentiary hearing was held on March 8, 2007.  The government was represented by Assistant United States Attorney Edward J. Rogers.  Defendant Verdugo was present and represented by his attorney, John D. Stobbs, II, and Defendant Briston was present and represented by her attorney Eric W. Butts.  At the hearing, the government presented the testimony of Sergeant McDonald Brand, who has been a member of the Missouri State Highway Patrol for thirteen years, and also works on assignment with the St. Louis County Interdiction Task Force; Detective Robert Tubbe, who has been employed with the St. Louis County Police Department for approximately five years; and Special Agent ("SA") Matt McKnight, a Special Agent with the Drug Enforcement Administration ("DEA").  The witnesses were cross-examined extensively by defense counsel.  Based on the testimony and evidence adduced and having had an opportunity to observe the demeanor and evaluate the credibility of the witnesses, the undersigned makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

On January 29, 2007, Sgt. McDonald Brand received information from the Super 8 Motel in Cuba, Missouri, regarding possible illegal drug activity.  He was advised that the vehicle of an individual, later identified as co-Defendant Jesus Valdes, had broken down in Sullivan, Missouri, approximately 15 miles from Cuba, and had been towed back to Cuba, Missouri.  Valdes had paid for the tow with crisp $50 bills and then went into the motel to get a room for the night.  He was unable to speak English and payed for his room with two $50 bills.

Sgt. Brand went to the motel and located Valdes's vehicle, which was in the parking lot in front of the motel. He checked the vehicle registration, and learned that it was registered to an address in California. He checked with law enforcement regarding the California address and learned that there was an open DEA investigation with regard to the residence, and that vehicles and subjects at that residence were known to traffic in illegal narcotics.

By this time other officers had arrived at the motel, and they set up surveillance on Defendant Valdes's motel room. At approximately 12:30 p.m., Valdes left his room, walked to the front of the motel, and approached his vehicle in the front lot. He opened the trunk of the vehicle, waited approximately five minutes, and then closed the trunk. He then ate lunch at the Country Kitchen restaurant, adjacent to the motel, and returned to his room. Later in the evening, Valdes came out again, went to eat at the Huddle House restaurant, stopped at the gas station next to the motel, and returned to his room.

Sometime after Valdes returned to his room, an individual later identified as Defendant Ruben Verdugo arrived at the motel in a 2001 Pontiac. He went to Valdes's room, talking on a cell phone, knocked on the door, and Valdes let him inside. The two subjects left the room approximately ten minutes later, went to the lobby, and returned with a hotel dolly-type luggage rack, which they took inside the room. Five to ten minutes later, they came out, with certain objects on the luggage rack that the officers could not then identify. They went to the front lot, and Verdugo drove the Pontiac over to Valdes's car. The two subjects then took the items from the luggage rack, as well as

items from the trunk of Valdes's car, and loaded them into the Pontiac. They drove the Pontiac to the filling station, and Valdes put fuel in the car while Verdugo went inside the station. The two then re-entered the Pontiac, with Valdes in the driver's seat and Verdugo in the right back passenger seat. The officers observed a third person in the car, later identified as Defendant Rosetta Briston, in the front passenger seat.

The Defendants drove east on Interstate 44, while Sgt. Brand, who was dressed in street clothes and driving an undercover vehicle, followed in surveillance. Sgt. Brand paced the Pontiac and determined it was driving 7-8 miles in excess of the speed limit. The driver of the Pontiac also failed to signal as it changed lanes and failed to maintain the vehicle within a single lane. As a result of what he observed, Sgt. Brand called Corporal Brant Swearingin, a uniformed Missouri Highway Patrol officer, who was driving a marked unit, and advised him of the traffic violations he had observed. At some point Sgt. Brand ran the license on the Pontiac and learned that it was registered to Rosetta Briston and that there were no warrants or wanteds outstanding for her.

Cpl. Swearingin arrived approximately 8-9 minutes after the Defendants first left the motel. He determined that the Pontiac was speeding, activated his lights and pulled the car over. Cpl. Swearingin parked his marked unit behind the Defendants' vehicle, and Sgt. Brand parked behind the marked unit. Sgt. Brand stood at the right front side of the marked vehicle, while Cpl. Swearingin approached the driver, Valdes. Neither of the officers had their firearms drawn. Cpl. Swearingin attempted to speak to Valdes, but was unable to do so because Valdes did not speak English. Sgt. Brand, who does not speak

4

Spanish, also attempted to converse with Valdes but was also unable to do so.

Sgt. Brand approached Defendant Briston, who was seated in the front passenger seat and who spoke English fluently. This occurred approximately two minutes after the initial stop. He identified himself as a state trooper and advised her that their car had been stopped for a traffic violation and that they had been unable to communicate with Valdes. He asked if the car they were driving was hers, and she said yes. He inquired about the purpose of their travel, and Briston said that she had picked up Verdugo at the airport in Pittsburgh early that morning, and that he had asked her if she would be willing to drive to St. Louis, Missouri to pick up a friend (presumably referencing Valdes) whose car had broken down, and she agreed. She said she had known Verdugo for two years, and that they had some sort of relationship, and that Verdugo would fly out to see her in Pittsburgh 4-6 times a year.

Sgt. Brand then spoke with Defendant Verdugo, who was seated in the back seat of the Pontiac, with his arm stretched across an Igloo cooler on the back seat. He believed the conversation took place with Verdugo inside the car. Although Defendant Verdugo spoke in broken English, Sgt. Brand was able to understand what Verdugo was saying in English. Sgt. Brand inquired about the purpose of their travel, and his relationship to the others in the car. He did not consider Verdugo to be under arrest and believed he was free to leave, but he did not advise Verdugo that he was free to leave. Verdugo stated that he was en route from Pittsburgh, headed to St. Louis. Contrary to what Briston had stated, Verdugo said that he had known Briston approximately ten years

and that they had no relationship. He said he had gone to Pittsburgh from California to get some estimates on houses that he would then work on in California, and that he went to Pittsburgh regularly. He identified Valdes as a laborer who did construction work for him. The interview lasted 2-5 minutes.

By this time, Det. Damon Kunnemann and Trooper Mike Mielke had arrived at the scene. While Sgt. Brand was talking to Defendant Verdugo, Det. Kunnemann called Det. Tubbe, who is fluent is Spanish, on his cell phone. He advised Det. Tubbe of the situation, and had him speak with Defendant Valdes on the telephone in Spanish. Det. Tubbe introduced himself and identified who he worked for. He then advised Valdes that his job was to investigate narcotics offenses, and advised Valdes of his rights under Miranda, from memory. He asked Valdes if he understood, and he said yes and was cordial. He asked Valdes where he was from and where he was going. Valdes responded, but the content of his statements was not disclosed at the hearing. Det. Tubbe then spoke with Det. Kunnemann, who requested that he ask Valdes for consent to search. Det. Tubbe returned to speaking to Valdes and asked him for consent to search the Pontiac and its contents, and he agreed. Det. Tubbe also indicated that they wished to search Valdes's motel room, and Valdes agreed to this as well.

Det. Tubbe was then asked to speak to Verdugo in Spanish by telephone. He did not advise Verdugo of his rights under Miranda. In response to questions about the purpose of his travel, Verdugo said that Valdes had phoned him and stated that his car had broken down. He said Valdes was a friend of his, but that they were not related.

Verdugo said he agreed to pick up Valdes, who was going to Ohio. At some point in the conversation Det. Tubbe was told that Verdugo lived in Pennsylvania, and that he was going to Pennsylvania and Valdes was going to Ohio. Det. Tubbe related the content of his conversation, which lasted approximately five minutes, to the officers on the scene.

In the meantime, while Det. Tubbe was speaking with Valdes and Verdugo, Sgt. Brand returned to speak to Defendant Briston. Based on inconsistencies between the information provided by Briston and Verdugo, and in light of the other information learned through their investigation and surveillance, he asked Briston for consent to search the car. She agreed. He did not advise her of her rights under <u>Miranda</u> or advise her that she had the right to refuse to consent to the search or the right to stop the search any time. From the time of the initial stop, until Briston was asked for consent to search the car, approximately 8-10 minutes had passed.

In connection with their search of the Pontiac, the officers had the Defendants step out of the car and wait on the median on the side of the road. The Defendants were not cuffed and were not asked to sit down, but rather were asked to stand by the side of the road, where an officer stood with them. After searching the car for about ten minutes, Sgt. Brand asked Defendant Briston if it would be okay to move to a safer location to conduct the search. He made this request for everyone's safety as it was cold and windy outside, it was late at night, and there was heavy traffic on the highway. Briston agreed. They then drove to the Sullivan police department, which was 1-1½ miles away. Sgt. Brand believed, but was not certain, that Briston drove the Pontiac and followed the

marked unit to the station.  Sgt. Brand did not know whether Cpl. Swearingin had issued a citation to Valdes, and there was no further evidence on this issue.

At the police department, the Pontiac was searched more thoroughly.  While the search took place, the three Defendants were inside the police station.  From where they were stationed, Defendants would have been able to observe the search if they looked through the window in the door.  The cooler that was on the back seat of the Pontiac was opened, and the officers observed that the inner liner had previously been removed or tampered with.  They pulled out the liner and found 4 kilograms of cocaine inside the foam wall of the cooler.  After they discovered the cocaine, they contacted the DEA and all three Defendants were placed under arrest.  SA Matt McKnight, with the DEA, arrived and took custody of the cocaine and the cooler.

SA McKnight and Sgt. Brand then spoke with Defendant Briston in a room at the police department.  They were seated at a long table in a large meeting room, and only the three of them were present.  SA McKnight was wearing blue jeans and a t-shirt.  Neither of the officers had their weapons displayed and Defendant was not restrained in any fashion.  By this time it was approximately 10:30 p.m., which was approximately one hour after the initial stop was made.  Although Defendant appeared to be upset about the situation, she was lucid, did not appear to be under the influence of drugs or alcohol, and appeared to be in control of her senses.  SA McKnight advised Briston of her rights under Miranda from a card that he keeps with him.  At the hearing, he read those rights into the record, as he had read them to Briston.  He asked her if she understood her rights, and she

said she did.  No promises or threats were made to induce Defendant to make a statement.

SA McKnight believed he told her, as he typically tells interviewees, that they were trying

to figure out what was going on, and that if she knew something, it could be beneficial to

cooperate, but that he could not make any promises of any sort as far as any consideration.

After responding to questions pertaining to identifying information, Defendant Briston

then gave a short statement regarding what had happened.  The interview lasted no more

than ten minutes.

Sgt. Brand and SA McKnight next attempted to interview Defendant Verdugo.  As

he read Verdugo his rights, however, SA McKnight became concerned that his

understanding of English was not sufficient, as Defendant appeared confused when SA

McKnight began to advise him about his right to have a lawyer present.  As a result of his

concerns, the interview was discontinued, and Defendant Verdugo made no statements

following his arrest.

## CONCLUSIONS OF LAW

Defendant Verdugo asserts that the officers exceeded the scope of the traffic stop,

and that any statements made by Defendant following the issuance of the traffic citation

should be suppressed.  (Doc. #51).  Defendant Briston more generally asserts that any

statements were elicited by coercion and without proper advice of her Fifth Amendment

rights, and that any physical evidence seized was obtained in violation of her

constitutional rights.  (Doc. #52).

## A.    Validity and Scope of the Stop

The law is clear that when a police officer observes a traffic violation – however minor – he has probable cause to stop the vehicle. Whren v. United States, 517 U.S. 806, 818 (1996); United States v. Martin, 411 F.3d 998, 1000 (8th Cir. 2005). "This is true even if a valid traffic stop is a pretext for other investigation." United States v. Linkous, 285 F.3d 716, 719 (8th Cir. 2002). Here, the evidence is undisputed that both Sgt. Brand and Cpl. Swearingin personally observed traffic offenses committed by the driver of the vehicle in which Defendants Verdugo and Briston were riding. As such, the officers had probable cause to stop the car.

Once an officer has a right to stop a driver, the officer may "conduct an investigation 'reasonably related in scope to the circumstances that justified the interference in the first place.'" United States v. Bloomfield, 40 F.3d 910, 915 (8th Cir. 1994) (quoting United States v. Cummins, 920 F.2d 498, 502 (8th Cir. 1990)). "This reasonable investigation includes asking for the driver's license and registration, requesting that the driver sit in the patrol car, and asking the driver about his destination and purpose." Id.; United States v. Jones, 269 F.3d 919, 924-5 (8th Cir. 2001). Officers may also ask the same information of passengers. Linkous, 285 F.3d at 719. The officers here were therefore justified requesting the identity of the driver and the passengers, ascertaining the ownership of the vehicle, and inquiring about the parties' destination and purpose. United States v. Pulliam, 265 F.3d 736, 740 (8th Cir. 2001); United States v. Winters, 221 F.3d 1039, 1041 (8th Cir. 2000); United States v. Barahona, 990 F.2d 412,

416-7 (8th Cir. 1993).

The law is also clear that when "'the responses of the detainee and the circumstances give rise to suspicions unrelated to the traffic offense, an officer may broaden his inquiry and satisfy those suspicions.'"  United States v. Johnson, 58 F.3d 356, 357 (8th Cir. 1995) (quoting Barahona, 990 F.2d at 416).  Police officers may briefly detain an individual for an investigative purpose when they have a reasonable belief that "criminal activity may be afoot."  Terry v. Ohio, 392 U.S. 1, 30 (1968).   The reasonable belief requires suspicion based on "'particularized, objective facts which, when taken together with rational inferences from those facts, reasonably warrant[] suspicion that a crime [is] being committed.'"  United States v. Beck, 140 F.3d 1129, 1136 (8th Cir. 1998) (quoting United States v. Martin, 706 F.2d 263, 265 (8th Cir. 1983)).

When an officer develops reasonable, articulable suspicion of criminal activity during a traffic stop, he is justified in making a greater intrusion unrelated to the traffic offense.  United States v. Pereira-Munoz, 59 F.3d 788, 791 (8th Cir. 1995); Bloomfield, 40 F.3d at 918.  Officers are "permitted 'to graduate their responses to the demands of the particular situation.'"  Pereira-Munoz, at 791 (quoting United States v. Place, 462 U.S. 696, 710 n.10 (1983)).  The reasonable suspicion is assessed in light of the totality of the circumstances, taking into consideration the officers' experience.  Id.

> The scope of the intrusion permitted will vary to some extent with the
> particular facts and circumstances of each case. . . .  [A]n investigative
> detention must be temporary and last no longer than is necessary to
> effectuate the purpose of the stop.  Similarly, the investigative methods
> employed should be the least intrusive means reasonably available to verify

or dispel the officer's suspicion in a short period of time.

Florida v. Royer, 460 U.S. 491, 500 (1983).  See Bloomfield at 916; United States v.
Willis, 967 F.2d 1220, 1224 (8th Cir. 1992).

The Court rejects Defendant Verdugo's contention that the officers expanded the
scope of the traffic stop without reasonable suspicion.  Here the officers had reasonable
suspicion based on Valdes's conduct at the motel, including his towing of the car back to
Cuba, Missouri and then leaving it at the motel, his payment for the room and the tow in
cash and with crisp $50 bills, his further suspicious conduct in the parking lot before
Verdugo's arrival, and the fact that the address where his car was registered was the
subject of an open DEA investigation and that individuals and vehicles associated with the
address were known to be connected to drug trafficking.  Their suspicions were reasonably
further heightened when Verdugo and Briston gave conflicting stories about their
relationship and the circumstances surrounding their travel.  Indeed, that Verdugo flew to
Pittsburgh, and then had Briston drive him to Cuba, Missouri to pick up Valdes, leaving
Valdes's car in Cuba, also raises questions.

In light of these facts, it was reasonable for the officers to detain all three
Defendants for further inquiry and to request consent to search.  United States v. Blaylock,
421 F.3d 758, 769 (8th Cir. 2005) (passenger's extreme nervousness, combined with
presence of masking odors, contradictory statements, and driver's vague reasons for trip,
provided reasonable cause to detain vehicle for canine search), cert. denied, 126 S.Ct.
1108 (2006); accord United States v. Sanchez, 417 F.3d 971, 975-76 (8th Cir. 2005);

United States v. Poulack, 236 F.3d 932, 935-6 (8th Cir.), cert. denied, 534 U.S. 864 (2001);  United States v. Lyton, 161 F.3d 1168, 1170-71 (8th Cir. 1998).  See also United States v. Yang, 345 F.3d 650, 654 (8th Cir. 2003) ("the time it takes for an officer to find out if consent will be given cannot be an unlawful detention in the absence of coercive or otherwise unusual circumstances"), cert. denied, 541 U.S. 952 (2004).  It was also reasonable to request that they move to another location to complete the search.  See United States v. Montano-Gudino, 309 F.3d 501, 504 (8th Cir. 2002).

Because the officers' investigative detention did not violate the Fourth Amendment, any argument that the search was the product of an illegal seizure has no merit.  Lyton, 161 F.3d at 1171; United States v. Miller, 20 F.3d 926, 930 (8th Cir. 1994).

## B. **Statements Made at the Time of the Stop**

Defendant Verdugo seeks to suppress the statements made by him at the scene, essentially asserting they were the product of an unlawful seizure and search.  The Court rejects this argument, having found the stop and the detention to be valid and supported by reasonable suspicion.  Though not specifically raised by either Defendant, the Court also finds that Defendants' statements are not subject to suppression due to the failure to advise Defendants of their Miranda rights.  The Supreme Court has recognized that "[i]f a motorist who has been detained pursuant to a traffic stop thereafter is subjected to treatment that renders him 'in custody' for practical purposes, he will be entitled to the full panoply of protections prescribed by Miranda."  Berkemer v. McCarty, 468 U.S. 420, 440 (1984).  However,  "'most Terry stops do not trigger the detainee's Miranda rights.'"

<u>United States v. Martinez</u>, 462 F.3d 903, 909 (8th Cir. 2006), <u>cert. denied</u>, __ U.S. __,

2007 WL 408193 (2007) (quoting <u>United States v. Pelayo-Ruelas</u>, 345 F.3d 589, 592 (8th

Cir. 2003)).

On these facts, the Court finds the officers were not required to advise the

Defendants of their rights under <u>Miranda</u>.  All of the questioning by the officers pertained

to the reason for their travel and was directly related to the officers' reasonable suspicions.

The questioning took place with Defendants in the car, on the side of the road and in view

of other drivers, and as it lasted at most ten minutes, was no longer than was necessary to

address the officers' suspicions.  The Defendants were not patted down or restrained in

any manner, and no force of any sort was displayed or exerted during the course of their

questioning.  Defendant Verdugo also had the opportunity to speak to a Spanish-speaking

agent on the telephone, at which time he could have explored any questions he might have

had.  As such, under the totality of the circumstances, the Court finds that Defendants

were not in custody for purposes of <u>Miranda</u>, and their statements made during the course

of the <u>Terry</u> stop are not subject to suppression.  <u>See</u> <u>Pelayo-Ruelas</u>, 345 F.3d at 593

(holding that where defendant was removed from car and patted down in connection with

drug investigation, <u>Miranda</u> warnings were not required and statements were not subject to

suppression, where only one agent approached and questioned defendant, agent was in

plain clothes and did not draw weapon, atmosphere was like typical traffic stop, and

investigation was reasonably limited to confirming or dispelling suspicions).

## C. **Consent to Search**

The officers also had valid consent to search the car.  In the context of a warrantless search, it is the prosecution's burden to prove by a preponderance of the evidence that a consent to search was freely given.  <u>United States v. White</u>, 81 F.3d 775, 780 (8th Cir.) <u>cert. denied</u>, 519 U.S. 1011 (1996); <u>Miller</u>, 20 F.3d at 930.  The consent, however, need not necessarily be knowing and intelligent.  <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 241 (1973).  One need not be aware of his or her right to consent in order to make the consent voluntary.  <u>United States v. Chaidez</u>, 906 F.2d 377, 380 (8th Cir. 1990).

A consent is voluntary if it is the product of free choice, the defendant's will is not overborne, and the consent is not given under coercion or duress.  In determining whether the prosecution has met its burden, courts look to both the characteristics of the accused and the details of the environment in which the consent was given.  <u>Chaidez</u>, 906 F.2d at 381.  Voluntariness is a fact question to be determined from the totality of the circumstances present.  <u>Schneckloth</u>, 412 U.S. at 226-227; <u>United States v. Matlock</u>, 415 U.S. 164 (1964).  The factors to be considered in determining whether consent is voluntary include:

> (1) the defendant's age; (2) the defendant's general intelligence and education; (3) whether the defendant was under the influence of drugs or alcohol; (4) whether the defendant was informed of his Miranda rights  prior to the consent; and (5) whether the defendant had experienced prior arrests so that he was aware of the protections the legal system affords to suspected criminals.

<u>United States v. Alcantar</u>, 271 F.3d 731, 737 (8th Cir. 2001); <u>accord</u> <u>United States v.</u>

Hathcock, 103 F.3d 715, 719-20 (8th Cir. 1997); Chaidez, 906 F.2d at 381. Among the factors to be considered in examining the environment surrounding the consent, courts examine: the length of time a person is detained and questioned; whether the person was threatened, physically intimidated, or punished by the police; whether the defendant relied upon promises or misrepresentations made by the police; whether the defendant was in custody; whether the consent occurred in a public or secluded location; and whether the defendant objected to the search or stood silently by while the search occurred. United States v. Smith, 260 F.3d 922, 924 (8th Cir. 2001); Chaidez at 381. The foregoing factors are not to be applied mechanically, and no single factor is dispositive. Schneckloth, 412 U.S. at 226-27; Chaidez, at 381.

Applying the above factors, the government has met its burden to establish that the consent by Defendant Briston was voluntary. On this record there is nothing to suggest that Defendant's will was overborne. Poulack, 236 F.3d at 936; Miller, 20 F.3d at 930. At the time of the incident, Defendant was 34 years old. She did not appear to be under the influence of any drugs or narcotics, appeared to understand what was being said, and provided responsive answers. While there were several officers present, at the time consent was requested, only one of those officers was speaking to Defendant Briston; the other officers were engaged with others. Moreover, only approximately ten minutes had passed from the time of the stop until consent was given, and the request was made on the side of a busy public highway. No threats or promises were made to induce Briston to consent, and none of the officers displayed their firearms or otherwise exerted any force

upon any of the Defendants.

While Sgt. Brand did not advise Defendant of her <u>Miranda</u> rights at this time, or advise her of her right to refuse consent, such advice is not required for a valid consent to search. <u>United States v. Vera</u>, 457 F.3d 831, 835 (8th Cir. 2006) (recognizing there is no requirement that officer inform citizen of right to refuse consent, and no presumption that consent is invalid where given without explicit notification of right to refuse to consent), <u>cert. denied</u>, __ U.S. __, 2007 WL 506440 (2007); <u>Montano-Gudino</u>, 309 F.3d at 504 (same); <u>United States v. Payne</u>, 119 F.3d 637, 643-44 (8th Cir. 1997) ("We have never held that a request to search must be preceded by <u>Miranda</u> warnings or that a lack of <u>Miranda</u> warnings invalidates a consent to search."). Nor is her consent rendered involuntary by the fact that there is no evidence regarding whether Valdes's license had been returned prior to requesting consent, or by the failure to have Briston sign a consent to search form. <u>See</u> <u>United States v. Siwek</u>, 453 F.3d 1079, 1084 (8th Cir. 2006) (citing cases).

As in <u>Montano-Gudino</u>, the Court finds that, other than the fact of Defendant's detention, there is no evidence to suggest her consent was not freely and voluntarily given. <u>Montano-Gudino</u>, 309 F.3d at 504; <u>accord</u> <u>United States v. Thompson</u>, 408 F.3d 994, 996 (8th Cir. 2005) (although police implied that if defendant voluntarily consented to search police would not ticket defendant to full extent, consent to search found voluntary where defendant was adult with lengthy criminal record, traffic stop had lasted only a few minutes, and police treated defendant politely).

Defendant Briston thereafter agreed to permit the officers to move her car to a safer place to conduct the search. Neither the fact that the officers had not found any contraband during their initial search on the highway, nor the time it took to conduct the search undercut the validity of the subsequent search. Only twenty minutes passed from the time of the initial stop until the request was made to move to another location, and at most, 60 minutes passed from the time of the initial stop until the narcotics were discovered. While the search was being conducted, Defendant Briston was not restrained, and at no time did she ask that the search be discontinued. See United States v. Saenz, 474 F.3d 1132, 1137 (8th Cir. 2007) (finding consent to search voluntary, though no Miranda warnings given, where officers' request to move truck to safer area with less traffic was not coercive, officers did not make threats or promises or suggest defendant could not refuse consent, detention was for brief period of time, and defendant was silent during search). Based on the totality of the circumstances, the Court concludes that Defendant Briston voluntarily consented to a search of the vehicle. See White, 81 F.3d at 780.

Even if there were some question regarding whether Briston voluntarily consented to the search – and there is not – the search still would not be invalid as the driver of the car, Valdes, also gave consent, after being fully advised, in Spanish, of the nature of the investigation and of his rights under Miranda. Where, as here, Briston did not object to the search of the car, Valdes's consent provided an independent basis for searching the car. See Alcantar, 271 F.3d at 73 n.7 (driver may consent to the search of a car, even if

18

another is present who also has control of the car, so long as the other person does not object).

### D.  Post-Arrest Statements Made by Defendant Briston

Defendant Briston finally asserts, more generally, that her statements were not voluntary and were the product of coercion.  A defendant may knowingly and intelligently waive her rights and agree to answer questions.  Miranda v. Arizona, 384 U.S. 436, 479 (1966).  When the prosecution seeks to introduce in evidence a statement made by a defendant while in custody, it has the burden of showing by a preponderance of the evidence that the statement was made after a voluntary, knowing, and intelligent waiver of Miranda rights by the defendant.  Colorado v. Connelly, 479 U.S. 157 (1986).  The court must examine the totality of the circumstances surrounding the interrogation to determine whether the waiver was the product of a free and deliberate choice, rather than intimidation, coercion, or deception, and whether the waiver was made with an awareness of the right being abandoned and the consequences of the decision to abandon it.  Moran v. Burbine, 475 U.S. 412 (1986).  The statement must be voluntary and not the product of any police conduct by which the defendant's will is overborne.  Connelly, 479 U.S. at 170;  Haynes v. Washington, 373 U.S. 503 (1963).  "The requirement that Miranda warnings be given does not, of course, dispense with the voluntariness inquiry."  Dickerson v. United States, 530 U.S. 428, 444 (2000).  As the Supreme Court has recognized, however, "[c]ases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that law enforcement

authorities adhered to the dictates of <u>Miranda</u>, are rare." <u>Berkemer v. McCarty</u>, 468 U.S. 420, 433 n.20 (1984). <u>See</u> <u>Dickerson</u>, 530 U.S. at 444.

At the Sullivan police department, following her arrest, Defendant was advised of her rights under <u>Miranda</u> prior to questioning. She stated that she understood her rights, and agreed to make a statement. The interview that followed took place within an hour of the initial stop, was conducted by only two agents, and Defendant was not restrained in any fashion. As set forth above, Defendant is an adult who did not appear to be under the influence of any drugs or alcohol, or to be impaired in any other manner. No promises or threats were made to induce Defendant's waiver or her oral statements, and the interview itself lasted only approximately ten minutes. Based on the totality of the circumstances, the Court finds Defendant knowingly and voluntarily waived her rights and made a voluntary oral statement.

Accordingly,

**IT IS HEREBY RECOMMENDED** that the Motion to Suppress filed by Defendant Ruben Verdugo [Doc. No. 51] be **denied**.

**IT IS FURTHER RECOMMENDED** that the Motion to Suppress Evidence and Statements filed by Defendant Rosetta Maenelle Briston [Doc. No. 52] be **denied**.

**IT IS HEREBY ORDERED** that Defendant Briston's Motion for agents to retain rough notes [Doc. No. 53] is **denied as moot**.

**IT IS FURTHER ORDERED** that Defendant Briston's Motion for disclosure of favorable evidence [Doc. No. 54] is **denied as moot**.

**IT IS FURTHER ORDERED** that Defendant Briston's Motion for disclosure pursuant to Rules 404(b) and 609 [Doc. No. 55] is **denied as moot**.

This trial in this matter has been set for **Tuesday, May 29, 2007 at 9:30 a.m. before the Honorable Judge Henry E. Autrey.**

The Clerk of the Court is directed to give notice of the trial setting to Defendant Jesus Enrique Valdes.

The parties are advised that they have eleven (11) days in which to file written objections to this report and recommendation pursuant to 28 U.S.C. §636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. See Thompson v. Nix, 897 F.2d 356 (8th Cir.1990).

_____
AUDREY G. FLEISSIG
United States Magistrate Judge

Dated this 20th day of March, 2007.